O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RHONDA J. H.,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>ANDREW M. SAUL, Commissioner<br>of Social Security,<br><br>　　　　　Defendant. | Case No. 5:19-cv-01738-KES<br><br>MEMORANDUM OPINION AND<br>ORDER |

# I.

## PROCEDURAL BACKGROUND

In September 2015, Plaintiff Rhonda J. H. ("Plaintiff") applied for Social Security Disability Insurance Benefits, alleging that she became disabled at age 50 on August 24, 2015, an onset date later amended to August 21, 2015.[1]

---

[1] Plaintiff was previously awarded Social Security benefits in May 2000. AR 195.  Plaintiff returned to work from 2007-2015 as a retail sales associate at Lowe's in North Carolina, a job classified as "heavy" that required her to stand/walk all 8 hours of her workday, sometimes lift 100 pounds, and frequently lift 50 pounds.  AR 47, 156, 197, 224.  She stopped working at Lowe's in November 2015 when she "couldn't walk" due to "too much pain."  AR 35, 44.

Administrative Record ("AR") 67, 150, 152, 183.  On July 25, 2018, the
Administrative Law Judge ("ALJ") conducted a hearing at which Plaintiff, who
was represented by counsel, testified along with a medical expert and a vocational
expert ("VE").  AR 31-53.

On August 10, 2018, the ALJ issued an unfavorable decision.  AR 7-25.
The ALJ found that Plaintiff suffered from the severe impairments of "obesity, hip
arthritis, hip bursitis, levoscoliosis, spondylolisthesis, unspecified depressive
disorder, unspecified anxiety disorder, attention deficit disorder (ADD),
osteoarthritis of the knees with status post total right knee replacement and status
post lumbar fusion."  AR 12.  Despite these impairments, the ALJ found that
Plaintiff had the residual functional capacity ("RFC") to perform medium work, as
follows:

> [T]he claimant can lift and/or carry fifty pounds occasionally, twenty-
> five pounds frequently; the claimant can sit, stand or walk for six
> hours out of an eight-hour workday; the claimant can frequently
> climb ramps, stairs, ladders, ropes and scaffolds; the claimant can
> frequently balance, stoop, kneel, crouch and crawl; the claimant is
> limited to non-complex, routine tasks; the claimant cannot interact
> with the public; the claimant cannot perform tasks requiring reading
> past a third grade reading level.

AR 15, citing 20 C.F.R. § 404.1567(c) (defining "medium" work).

Based on this RFC and the VE's testimony, the ALJ found that Plaintiff
could not perform her past relevant work at Lowe's, but that she could perform
alternative occupations including cleaner II (Dictionary of Occupational Titles
["DOT"] 919.687-014), gas and oil servicer (DOT 915.587-018), and laundry
worker I (DOT 361.684-014).  AR 23-25.  The ALJ concluded that Plaintiff was
not disabled.  AR 25.

**II.**

**ISSUES PRESENTED**

Issue One A:  Whether the ALJ's RFC assessment for medium work is supported by substantial evidence.

Issue One B:  Whether the ALJ erred by failing either to incorporate into Plaintiff's RFC Dr. Sanicola's opinion that Plaintiff's work environment should not have "a great deal of noise" or give reasons for rejecting it.

Issue Two:  Whether the ALJ erred in evaluating Plaintiff's subjective symptom testimony.

(Dkt. 19-1, Joint Stipulation ["JS"] at 4.)

**III.**

**SUMMARY OF THE EVIDENCE**

**A. Medical Evidence.**

This summary focuses on Plaintiff's orthopedic impairments, because Plaintiff primarily challenges her ability to do medium work.

**1.  Medical Opinion Evidence.**

Three different doctors offered opinions about Plaintiff's exertional abilities. First, on December 11, 2015, consultative examiner Dr. John Godes performed an internal medicine evaluation.  AR 621-26.  Plaintiff drove to her appointment, and her chief complaints were hypertension and low back pain.  AR 621.  Dr. Godes observed that Plaintiff could get in and out of the chair without difficulty.  AR 622. She had tenderness in the lower lumbar spine and paravertebral areas and some limited range of back motion but a negative straight-leg raising test with no sciatic pain.  AR 624.  Plaintiff's upper and lower extremity examinations were normal, and she had normal motor strength, no hypesthesia (diminished sensation) upon sensory examination, and a normal gait.  AR 624-25.  Dr. Godes opined that Plaintiff could perform medium exertional work.  AR 625-26.

A few days later on December 21, 2015, state agency consultant Dr. Sohn

also opined that Plaintiff could do medium work.  AR 63-64.

In February 2016, Plaintiff's general treating physician, Dr. Meier, opined that Plaintiff should not lift any weight, even less than 5 pounds, prior to spinal surgery scheduled for March 2016, and she could never bend, climb, or reach.  AR 767.

On September 13, 2017, Dr. Godes performed a second internal medicine evaluation to provide an updated examination and assessment, because Plaintiff underwent spinal lumbar fusion surgery in March 2016 and right knee replacement surgery in June 2017.  AR 1011-21.  His examination revealed tenderness to palpation of the lower lumbar spine area; a limited range of back motion but a negative straight-leg raising test; normal hip range of motion; knee flexion at 130/130 degrees and right knee extension at 10/0 degrees; ankle dorsiflexion at 20/20 and plantar flexion at 40/40 degrees; equal deep tendon reflexes; full (5/5) strength in all extremities; and a normal gait.  AR 1012-14.  He again opined that Plaintiff could perform medium work.  AR 1014.

At the same time, Dr. Godes completed a checkbox form indicating that Plaintiff could perform medium work.  He also noted that she was limited to occasional climbing of ladders or scaffolds and could frequently perform other postural activities, frequently use her hands and feet, and have frequent exposure to certain listed environmental conditions.  AR 1016-20.

### 2.  Treating Records.

#### a.  Pre-Onset Records.

Plaintiff's Kaiser records show treatment for thyroid issues, obesity, and high blood pressure in 2008 and 2009.  AR 326, 333.  She reported hip pain and stiffness due to bursitis as early as April 2009, and she was taking ibuprofen.  AR 362-63, 381; see also AR 503 (in 2014, she reported taking ibuprofen for 2 years).  She had some limited hip range of motion and leg pain in 2009.  AR 379.  In 2010, she could exercise "630 minutes per week at a moderate to strenuous level."  AR

4

428.  In 2011, she exercised 840 minutes per week at a moderate to strenuous level and could run 5-10 miles.  AR 443-44.  In 2013, she reported hip pain while running, but she had a normal gait, normal range of motion ("ROM"), and negative straight-leg raising test.  AR 459, 467.  In 2014, she reported hip, knee, and foot pain that she attributed to leg length discrepancy, a condition she had since childhood.  AR 363, 514, 503.  Imaging from 2014 showed "min to mild" osteoarthritis affecting her right hip joint, treated via a steroid injection (which helped "about 50%") and "relief with Celebrex."  AR 504, 533, 540-41.

In March 2015, she told doctors that she "feels good," was "[w]ithout any complaints," and her hip pain was "wear and tear."  AR 545.  She was counselled to wear more cushioned shoes while working at Lowe's.  AR 546.

In July 2015, Plaintiff had an initial consultation at Newport Orthopedic Institute ("NOI").  AR 592.  She complained of "chronic back and hip pain worsening over the past four years" for which she was taking ibuprofen and Celebrex.  Id.  NOI conducted a physical examination, noting no muscle spasms or tenderness, normal gait, full motor strength, and a negative straight-leg raising test.  AR 592-96.  She was treated with a hip injection, prescribed Voltaren (a topical pain medicine), and referred for physical therapy and an MRI.  AR 596.  The July 2015 MRI revealed "grade I anterolisthesis of L4 and L5 with disc bulging … causing mild to moderate … stenosis" and "mild disc bulging throughout the remainder of the lumbar spine … causing mild … stenosis."[2]  AR 599.  NOI recommended against surgical intervention.  AR 755.

b.  August –December 2015

On August 10, 2015, NOI administered an epidural lumbar injection.  AR 598, 756.  On August 12, Plaintiff described her pain as "slight."  AR 758.  By

---

[2] Grade I is the mildest of four possible grades.  See https://www.cedars-sinai.edu/Patients/Health-Conditions/Anterolisthesis.aspx.

1   August 15, however, she described her pain as "severe" and was "not sure if it was
2   something [she] lifted" at work.  AR 757-58.

3          On August 18, 2015, Plaintiff reported to Dr. Meier right sciatic pain with
4   "radiation into foot and thigh worsening at work."  AR 568.  Dr. Meier prescribed
5   Flexeril for muscle spasms and advised her to follow up with NOI.  AR 569.

6          On August 21, 2015, Plaintiff attended physical therapy and reported
7   worsening pain since her lumbar injection.  AR 606-08.

8          On August 24, 2015, she reported to NOI "no good response" to the lumbar
9   injection.  AR 591, 598.  NOI diagnosed her as suffering from "mild-to-moderate
10  stenosis at L4-L5, grade I spondylolisthesis" per the July 2015 MRI and referred
11  her to pain management with no recommendation for surgical intervention.  Id.

12         On August 25, 2015, Plaintiff presented to chiropractor Dr. Iskander "in
13  acute distress, ambulates with antalgic gait due to evident back pain."  AR 919; AR
14  614, 922 (same in September 2015).  By September 28, 2015, she reported "low
15  back pain about 50% improved" from an injection, and Celebrex was "helping –
16  has reduced radiculopathy to the lower extremity," but she still felt pain in her right
17  hip, knee, and leg.  AR 926 (noting "antalgic gait").

18         In October 2015, however, she reported to Dr. Meier that she was "seeing
19  the spine specialist and getting injections" and new pain medication.  AR 691.  Dr.
20  Meier observed that Plaintiff was "[w]ell appearing, in no apparent distress."  AR
21  692.  Similarly, Plaintiff told Dr. Iskander that she was "doing pretty well," her
22  medications "provide a substantial level of relief," and her symptoms were stable.
23  AR 930; AR 942 (noting 50% relief with last injection).

24         Dr. Godes performed his evaluation in December 2015.  AR 621.  At that
25  time, he observed a normal gait.  AR 625.

26                          c.  2016
27         On January 12, 2016, Plaintiff presented to Memorial Care/Dr. Meier
28  complaining of right ankle pain after "driving for three hours."  AR 701-02.  She

6

had a fatty tissue lump on her right ankle.  AR 706.  She also reported that she had experienced "so much low back pain and R sciatica" that she had scheduled surgery with the spine specialist.  AR 702.  While she was intent on surgery, she had "no abnormal gait or limp."  AR 703.

On January 18, 2016, she saw specialist Dr. Peters complaining of lower back pain.  AR 777.  He ordered new MRIs.  AR 778.  An MRI of Plaintiff's lumbar spine on January 26, 2016 revealed moderate facet disease at L3-L4 and severe facet disease at L4-L5 with L5-S1 still characterized as "grade I spondylolisthesis."  AR 740-41, 779.  Dr. Peters reviewed these results with Plaintiff and approved her request for spinal surgery.  AR 781.

On March 8, 2016, Plaintiff underwent lumbar spinal surgery to fuse her vertebrae at the L4-5 and L5-S1 levels.  AR 782-83.  At a post-op check-up on March 14, she reported back pain at 4/10 and "doing well, improving" but was experiencing right knee pain.  AR 785.  On March 28, she reported "low back pain is tolerable."  AR 789.  By May 2016, she reported that her back pain had decreased to 1/10 and "her largest pain" was her right knee.  AR 790.  Dr. Peters assessed that she was "[d]oing well from lumbar standpoint."  Id.  Dr. Peters ordered an MRI of Plaintiff's right knee to "rule out meniscal tear."  AR 791.

The May 2016 MRI of Plaintiff's right knee revealed a torn meniscus and "tricompartmental osteoarthritis."  AR 792-93.  She had an injection in June that provided "excellent benefit for 3 days" until her symptoms "completely returned."  AR 825.

On June 8, 2016, post-surgical lumbar x-rays revealed "stable postsurgical change" with only "mild degenerative changes" to Plaintiff's other spinal regions.  AR 794.  Nevertheless, on June 14, 2016, Plaintiff told Dr. Peters that her lumbar pain was 6/10 with "increased muscle spasm."  AR 796.  He observed, however, that she had a normal gait, normal muscle tone and strength, and a normal spinal ROM.  Id.  Dr. Peters suggested she had "muscle spasm from increased activity

7

and PT"; he changed her medication and instructed her to follow up in one month. Id.

On June 23, 2016, Plaintiff underwent arthroscopy surgery of her right knee, confirming a medial meniscal tear.  AR 799-800, 825.  Post-surgery, she was instructed to slowly increase her activity level with home exercises.  AR 826.  By July 15, 2016, she was "slowly improving but is still having pain with weightbearing."  AR 827.

On July 28, 2016, Plaintiff returned to Dr. Peters and reported that her lumbar pain was 3/10.  AR 798.  She reported that "[t]aking her muscle relaxer at night and wearing a lumbar support during the day … is helping."  Id.  He scheduled her to follow up in three months.  Id.

In October 2016, Plaintiff told chiropractor Dr. Iskander that she "did well with the recovery" from the fusion surgery but was "having spasms that are not letting up."  AR 974.  He administered trigger point injections.  AR 974-75.  He noted "she did well at about 50% relief" with the last injection.  AR 982.

In October and December 2016, Plaintiff received Synvisc injections to her right knee without reported benefit.  AR 859-60, 911.

In December 2016, Plaintiff's right knee was evaluated by Orange County Orthopedic Specialists ("OCOS") due to pain and swelling.  AR 904.  Dr. Blanks confirmed that she suffered from right knee osteoarthritis causing "moderate degenerative changes."  AR 905-06.  He administered a cortisone injection and provided a medial unloader brace.  AR 906.

d.  2017

On March 13, 2017, OCOS examined Plaintiff's knees and observed them to be in the same condition as in December 2016.  AR 907.  OCOS administered a steroid injection to the left knee.  AR 908.  OCOS wrote, "X-rays of the bilateral knee demonstrate severe degenerative changes."  AR 907.  Plaintiff elected to proceed with right knee replacement surgery.  AR 908.

On March 25, 2017, she reported to the emergency room ("ER") with swelling and acute left knee pain at the injection site. AR 853-54, 861-63, 909. She was diagnosed with a staph infection and treated with antibiotics. AR 870. In contrast to what OCOS had written just two weeks before, ER staff wrote that her left knee x-rays showed only "minor degenerative changes." AR 877. At that time, her right knee had "movements intact, no swelling." AR 871.

By April 2017, Plaintiff was still on antibiotics and taking Norco, ibuprofen, and Celebrex for pain as needed. AR 856-57, 912-13. She returned to Dr. Iskander to address lumbar pain caused by "being in the hospital for 3 days" for her staph infection. AR 949. Regarding her back, he noted, "She had great results with Traumeel and Spacupreel lasting 5 months ago and has had much relief." AR 949, 989. He administered trigger point injections. AR 950. After those injections, she was "much better" and "able to increase her ADL's" but she was "still having pain when she is sitting for long periods of time." AR 953. He administered more trigger point injections. AR 954.

In May 2017, she was evaluated for right knee replacement surgery. AR 1043. She had a normal gait. AR 1044.

In June 2017, Plaintiff had no back tenderness (AR 1040), but she had right knee replacement surgery. AR 1011, 1027. Pre-surgical x-rays of the right knee showed "bone-on-bone medially." AR 1041. By July, she was "doing very well" with only "mild to moderate" right knee pain. AR 1037. X-rays showed a "well-placed total knee replacement" with "[n]o abnormality noted." Id. She started physical therapy. Id.

In August 2017, Plaintiff used a cane at her psychological evaluation. AR 1001. By September 13, 2017, however, Plaintiff reported "doing very well," "very happy with her progress," and "preoperative [knee] pain is gone." AR 1035. Similarly, in September 2017, Dr. Godes noted, "[g]ait is within normal limits. No assistive device is required for ambulation across the room." AR 1014; AR 1017

9

1  (does not require use of a cane to ambulate).  In November 2017, she was advised
2  to "[i]ncrease exercise."  AR 1051.  She continued to "lose significant weight with
3  bike riding and diet."  Id.

4  **B. Plaintiff's Testimony.**

5  Plaintiff initially sought disability benefits due to arthritis, scoliosis pain,
6  hip, leg, and foot pain, and pinched nerves, among other conditions.  AR 183.

7  On September 14, 2015, she reported that her condition had worsened,
8  because she had "sharp, stabbing pain" in her right leg that made it "extremely
9  difficult to stand, walk or climb stairs."  AR 233.  Also, her "right ankle has
10  developed a fatty tumor which impairs my flexibility."  Id.

11  On September 16, 2015, she completed a Function Report.  AR 210-17.  She
12  alleged that she was "in continuous and extreme pain whether sitting, walking, [or]
13  standing" and could not lift more than 20 pounds.  AR 210.  She described her
14  walk as a "shuffle" and wrote that she could only walk one "short block."  AR 211,
15  215.  She reported that ibuprofen made her sleepy.  AR 217.

16  At the hearing in July 2018, she testified that she was "okay" climbing the
17  stairs to her apartment, but she usually went "backwards going down."  AR 36.
18  She testified that when she stopped working at Lowe's in November 2015, "I
19  couldn't walk at that point."  AR 35, 44.  After her lumber fusion surgery, she had
20  "bad muscle spasms ... every day."  AR 45.  Regarding her activities, she
21  testified, "I basically just stay home."  AR 46.

**IV.**

**DISCUSSION**

24  **A. ISSUE ONE A: RFC for Medium Work.**

25  Plaintiff contends that an RFC for medium work is not supported by
26  substantial evidence, because she cannot lift 50 pounds up to 1/3 of the workday,
27  25 pounds up to 2/3 of the workday, and walk or stand for all of an eight-hour
28  workday with only normal breaks.  (JS at 5.)  According to Plaintiff, the ALJ opted

1    to "assign great weight" to the three medical opinions which state that Plaintiff can

2    do medium work – i.e., (1) Dr. Godes's December 2015 opinion (AR 621-26);

3    (2) Dr. Godes's September 2017 opinion (AR 1011-21); and (3) Dr. Sohn's

4    December 2015 opinion (AR 61-65) – and ignore Plaintiff's treating records.  (JS

5    at 5.)  Plaintiff suggests that since she underwent back surgery and knee surgery

6    during her claimed period of disability, "common sense" dictates that she could not

7    do medium work.  (JS at 12.)

8         Defendant counters that Dr. Godes and Dr. Sohn had the opportunity to

9    examine Plaintiff and/or review her medical records.  During his September 2017

10    evaluation, Dr. Godes knew that Plaintiff had undergone back surgery and knee

11    surgery.  Nevertheless, he found that she could still do medium work.  AR 1014.

12    Plaintiff did not challenge in her briefing the ALJ's reasons for weighing the

13    medical opinion evidence as she did.  Defendant concludes, "the ALJ's RFC

14    finding was supported by medical opinions in the record, and Plaintiff's 'common

15    sense' interpretation of the medical evidence does not trump the opinions of

16    multiple medical professionals."  (JS at 14.)

17         A district court will set aside a denial of Social Security benefits only when

18    the ALJ decision is "based on legal error or not supported by substantial evidence

19    in the record."  Benton ex rel. Benton v. Barnhart, 331 F.3d 1030, 1035 (9th Cir.

20    2003).  "'Substantial evidence' means 'more than a mere scintilla,' but 'less than a

21    preponderance.' It means 'such relevant evidence as a reasonable mind might

22    accept as adequate to support a conclusion.'"  Desrosiers v. Sec'y of Health &

23    Human Servs., 846 F.2d 573, 576 (9th Cir. 1988) (citations omitted).

24         The opinions of Drs. Godes and Sohn support the ALJ's determination, and

25    they are not so inconsistent with Plaintiff's treating records as to lack probative

26    value and fail to rise to the level of substantial evidence.  Per the evidence

27    summarized above, Plaintiff performed a very physical job at Lowe's until

28    November 2015.  AR 57, 156, 197, 224.  Spinal MRIs from July 2015 and January

2016 showed "grade I" problems, with the worst affecting her lumbar region.  AR 599, 740-41.  Her knee and lumbar condition were only severe enough to affect her gait in August – September 2015 (AR 919-26), but they improved with chiropractic treatment even before surgery (AR 625).  Her lumbar pain was ultimately addressed by fusion surgery, after which Plaintiff reported a good recovery and low levels of back pain.  AR 790, 798, 949, 1040.

While Plaintiff had a torn meniscus and arthritis affecting her right knee in May 2016 (AR 792-93), radiographs of her right knee in December 2016 demonstrated "moderate" degenerative changes (AR 905), while in March 2017, her left knee had only "minor degenerative changes (AR 877).[3]  Plaintiff continued to have a normal gait until her right knee replacement surgery (AR 796, 1044), after which she reported that her preoperative pain was gone (AR 1035) and she could walk normally and bike ride (AR 1014, 1051).  While there would have been times during her period of claimed disability when Plaintiff would not have been able to perform medium work due to her treatment (i.e., when she was recovering from back surgery, knee surgery, and a staph infection), functional limitations temporarily caused by treatment are not a basis to receive disability benefits.  See, e.g., Carmickle v. Comm'r of SSA, 533 F.3d 1155, 1165 (9th Cir. 2008) (affirming ALJ's finding that treating physicians' short-term excuse from work was not indicative of "claimant's long-term functioning").

**B.  ISSUE ONE B: Noisy Work Environment.**

**1.  Relevant Administrative Proceedings.**

In March 2016, Dr. Linda Sanicola provided opinions about the functional limitations caused by Plaintiff's mental impairments.  AR 769-74.  She reported

---

[3] Other records from the same time period characterize Plaintiff's x-rays and MRIs differently (see, e.g., AR 907, 911) but the existence of conflicting evidence does not undermine the substantial evidentiary support for the medical opinion evidence and the ALJ's reliance on that evidence.

that Plaintiff complained of "brain fog," attention deficit disorder, limited education, and difficulty with writing and spelling, such that tasks requiring those mental skills required "very intense effort and concentration."  AR 774.  Dr. Sanicola concluded, "These difficulties make it difficult for her to work in any environment in which there is a great deal of noise …."  Id.

The ALJ questioned the VE about a hypothetical worker with Plaintiff's RFC who was "limited to a quiet work environment."  AR 48.  The VE testified that there would be no work for such a person, because "medium work doesn't come with any quiet environments."  Id.  The ALJ asked the VE to consider whether the person could do any light or sedentary jobs, but the VE testified "I don't believe [so]," because of the RFC's limitations on reading and interacting with the public.  AR 49-50.  When the ALJ removed the limitation for a quiet environment, the VE testified that the occupations of cleaner II, gas/oil servicer, and laundry worker I would be available.  AR 51.

The DOT rates the noise intensity of different jobs on a scale of 1 to 5, as follows:

| Code | Level | Illustrative Examples |
|------|-------|----------------------|
| 1 | Very Quiet | Isolation booth for hearing test; deep sea diving; forest trail |
| 2 | Quiet | Library; many private offices; funeral reception; golf course; art museum |
| 3 | Moderate | Business office where type-writers are used; department store; grocery store; light traffic; fast food restaurant at off-hours |
| 4 | Loud | Can manufacturing department; large earth-moving equipment; heavy traffic |
| 5 | Very Loud | Rock concert – front row; jack-hammer in operation; rocket engine testing area during test |

The Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, Appendix D (1993).  The DOT rates the jobs of cleaner II and gas/oil servicer and "loud" and laundry worker I as "moderate."  (Dkt. 19-2, 19-3, 19-4.)

The ALJ ultimately assessed an RFC that limited Plaintiff to "non-complex, routine tasks" and did not require reading past a third-grade level.  AR 15.  The

13

RFC does not contain any noise limits.  Id.  The ALJ gave "some weight" to Dr.
Sanicola's opinions, "because the limitations assessed by Dr. Sanicola are not
inconsistent" with Plaintiff's RFC.  AR 23.

### 2. Analysis of Claimed Error.

Plaintiff argues that the ALJ failed to consider Dr. Sanicola's opinion that
Plaintiff should not work in environment with a "great deal of noise." (JS at 8,
citing AR 774.)  Defendant counters that any error is harmless, because by the
plain meaning of the words, "moderate" noise is not "a great deal of noise," and
the laundry worker I job, with 52,000 positions in the national economy, supports
the ALJ's step five finding that jobs exist in significant numbers in the national
economy that Plaintiff could perform.  (JS at 21.)

A Social Security Ruling equates "great" noise with excessive noise rather
than moderate noise, as follows:

> Where a person has a medical restriction to avoid *excessive*
> amounts of *noise*, dust, etc., the impact on the broad world of work
> would be minimal because most job environments do not involve
> *great noise*, amounts of dust, etc.
>
> Where an individual can tolerate very little noise, dust, etc., the
> impact on the ability to work would be considerable because very few
> job environments are entirely free of irritants, pollutants, and other
> potentially damaging conditions.
>
> Where the environmental restriction falls between very little
> and *excessive*, resolution of the issue will generally require
> consultation of occupational reference materials or the services of a
> [VE].

Social Security Ruling 85-15 (emphasis added).  The conclusion that "most job
environments do not involve great noise" weighs strongly against classifying jobs
with moderate noise as jobs involving "a great deal of noise."  See also Fox v.

Colvin, No. 12-2234, 2014 U.S. Dist. LEXIS 186, at *3 (W.D. Ark. Jan. 2, 2014) (affirming that a claimant limited to working "in a relatively calm setting without a great deal of noise" could work as a nursing home housekeeper [DOT 323.687-014], toy assembler [DOT 731.687-034], or small parts assembler [DOT 739.687-030], all jobs with "moderate" noise levels per the DOT.)

Consistent with the plain meaning of the words and these authorities, there is no conflict between Dr. Sanicola's opinion restricting Plaintiff from jobs with "a great deal of noise" and Plaintiff performing a job with "moderate" noise, like the laundry worker I job.  Thus, any error was harmless.  See Gutierrez v. Comm'r of SSA, 740 F.3d 519, 529 (9th Cir. 2014) (holding that 25,000 national jobs was a "close call" but sufficient as "work which exists in significant numbers"); Meanel v. Apfel, 172 F.3d 1111, 1114-15 (9th Cir. 1999) (indicating that court need not address claimant's arguments regarding one of two jobs identified by ALJ given that number of positions for one of those jobs constituted significant number).

## C. **ISSUE TWO: Plaintiff's Subjective Symptom Testimony.**

The ALJ found that Plaintiff's testimony concerning "the intensity, persistence, and limiting effects" of her symptoms was "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  AR 18.  Plaintiff argues that the ALJ "failed to specify which statements by Plaintiff concerning pain, functional limitations, and other symptoms were not sufficiently credible."  (JS at 25.)  Plaintiff further argues that the ALJ "failed to cite any clear and convincing reasons as to why she has rejected the totality of Plaintiff's subjective statements …."  (JS at 25-26.)

When there is objective medical evidence of an underlying impairment and no evidence of malingering, the ALJ must state specific, clear and convincing reasons for rejecting a claimant's subjective pain testimony.  See Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007).

1      **1.  <u>Reason One</u>: Lack of Supporting Objective Evidence.**

2          While a claimant's subjective statements about symptoms "cannot be

3  rejected on the sole ground that it is not fully corroborated by objective medical

4  evidence, the medical evidence is still a relevant factor." <u>Rollins v. Massanari</u>, 261

5  F.3d 853, 857 (9th Cir. 2001).

6          Here, the ALJ discussed the various x-rays and MRIs of Plaintiff's spine and

7  knees taken during the period of claimed disability.  AR 16-21.  The ALJ noted

8  that many of these imaging tests revealed only mild or "grade I" degenerative

9  changes.  <u>Id</u>.  The ALJ concluded, "the claimant's treatment records support a

10  finding that the claimant can perform a less than full range of medium work."  AR

11  23.

12          Regarding Plaintiff's lumbar spine, pre-surgery imaging was not dramatic.

13  AR 599 (July 2015 MRI with "mild to moderate" issues at L4-L5 and "mild"

14  issues elsewhere); AR 740-41 (January 2016 MRI with moderate facet disease at

15  L3-L4 and severe facet disease at L4-L5 and L5-S1 still characterized as "grade

16  I").  Plaintiff scheduled spinal surgery in January 2016, although at that time, she

17  displayed "no abnormal gait or limp."  AR 702-03.  Her June 8, 2016 post-surgical

18  lumbar x-rays revealed "stable postsurgical change" with only "mild degenerative

19  changes" elsewhere.  AR 794.

20          Regarding her knees, Plaintiff reported "painful hips and knees" in February

21  2014 while still working at Lowe's.  AR 514.  While no imaging was done of her

22  knees at the time, x-rays of her right hip showed "min to mild" arthritis.  AR 504.

23  The first right knee MRI in May 2016 revealed a torn meniscus and

24  tricompartmental osteoarthritis.  AR 792-93.  In June 2016, however, she had a

25  normal gait.  AR 796.  In December 2016, OCOS assessed "moderate degenerative

26  changes" to her knees (AR 905-06) but wrote a short time later in March 2017 that

27  "X-rays of the bilateral knee demonstrate severe degenerative changes."  AR 907;

28  AR 1041 (pre-surgical x-rays showed "bone-on-bone medially").  In May 2017,

however, she still had a normal gait.  AR 1044.  Just a month after right knee replacement surgery in June 2017, she was "doing very well" with only "mild to moderate" right knee pain.  AR 1037.  By September 2017, her preoperative knee pain was "gone" and she again had a normal gait.  AR 1014, 1035.

Thus, substantial evidence supports the ALJ's finding that the objective medical evidence in Plaintiff's treatment records was not consistent with the degree of pain and functional limitations alleged by Plaintiff.

## 2. <u>Reason Two</u>: Inconsistent with Medical Examinations and Observations.

The ALJ summarized observations and findings from Plaintiff's numerous physical and mental examinations and concluded "these findings are inconsistent with the alleged severity of her symptoms and functional limitations."  AR 17.

For example, the ALJ noted that Plaintiff testified she stopped working at Lowe's in November 2015 due to "pain with walking"  AR 15; AR 44 ("I couldn't walk at that point.").  The ALJ then set forth all the subsequent physical examinations that found Plaintiff had a normal gait.  AR 16-21.  The only medical records reflecting an abnormal gait are those of chiropractor Dr. Iskander from August and September 2015 (AR 919, 922), but he noted quick improvement with treatment (AR 16, citing AR 926) and by December 2015, Dr. Godes observed a normal gait.  AR 16, citing AR 625.

The ALJ also cited Plaintiff's Function Report from September 2015 stating that she had "continuous pain with sitting, standing, and walking."  AR 16, citing AR 210.  The ALJ then cited many medical records showing reduced pain with treatment and physical examinations inconsistent with this testimony, such as observations of full range of motion, only mild paraspinal tenderness, negative straight-leg raising tests, normal gait, etc.  AR 16-21.

The ALJ also noted, "On January 12, 2016, the claimant reported right ankle swelling after driving for three hours."  AR 16, citing 702.  An examination

revealed no tenderness, "full active and passive ROM," and "no abnormal gait or limp." AR 703.  The examination also revealed "soft tissue masses" characterized as "fatty tissue and lipoma."  AR 706.  This is apparently what Plaintiff was referencing in September 2015 when she reported that her "right ankle has developed a fatty tumor which impair[ed] [her] flexibility."  AR 233.  The ALJ cited Dr. Godes's reports refuting Plaintiff's allegations of ankle impairment.  AR 16-17, citing AR 625 (normal gait and ankle ROM in December 2015) and AR 1014 (full ankle flexion in September 2017).

Thus, the medical evidence not only fails to support Plaintiff's claims of continuous pain making her unable to walk more than a block (as discussed in Reason One), but also it affirmatively contradicts them.  This is a separate and distinct reason for discounting Plaintiff's claims.  See Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995) ("The ALJ also identified several contradictions between claimant's testimony and the relevant medical evidence and cited several instances of contradictions within the claimant's own testimony. . . .  Lastly, the medical records discredit claimant's assertion that her condition had not changed since 1983.").

### 3.  <u>Reason Three</u>: Inconsistent with Daily Activities.

The ALJ found Plaintiff's reported activities inconsistent with her claimed disability, as follows:

> Although the claimant's activities of daily living were somewhat limited, some of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment and are inconsistent with the presence of an incapacitating or debilitating condition.  The claimant indicated she performed personal grooming activities without problems, prepared simple meals, did laundry, went shopping, could go places alone and could drive a vehicle.  The

18

1    claimant's ability to participate in such activities undermines the

2    claimant's allegations of disabling functional limitations.

3    AR 16.  The ALJ concluded, "The claimant has described activities of daily living

4    that are compatible with competitive work.  For example, the claimant indicated

5    she performed personal grooming activities, prepared simple meals, did laundry,

6    went shopping, could go places alone and could drive a vehicle."  AR 23.  The ALJ

7    cited these activities as evidence that Plaintiff only had "moderate" limitations in

8    the area of self-management.  AR 14.  The Court therefore understands the ALJ to

9    have meant that Plaintiff's activities were inconsistent with her claim of disabling

10   mental impairment.[4]

11          Plaintiff identified "depression" as an impairment that limited her ability to

12   work.  AR 183.  She did not, however, check any boxes identifying areas of mental

13   functioning affected by her depression.  AR 215.  She did not need reminders to

14   complete tasks or take medication.  AR 212, 215.  She could, however, only pay

15   attention for one hour and was "fair" at following instructions.  AR 215.

16          At a psychiatric consultative examination, she told Dr. McGee that she has

17   "felt depressed since childhood.  She has problems with attention, concentration,

18   and memory, and she feels anxious."  AR 1000.  She dropped out of school in tenth

19   grade because it was "difficult for her to learn."  Id.  Still, these issues did not

20   prevent her from working at Lowe's, and she had the mental wherewithal to do

21   household chores, go grocery shopping, ride a bike, drive a car, take an Uber, and

22   manage her own funds.  AR 1001.

23

24          [4] If the ALJ intended to identify inconsistency with reported activities as a
25   reason to discount Plaintiff's pain testimony, then it would not be a clear and
     convincing reason.  The ALJ failed to identify how any of the cited activities are
26   inconsistent with Plaintiff's testimony about her physical limitations, e.g., that she
27   could only walk one block, only lift up to 20 pounds, had trouble climbing stairs,
     experienced pain with prolonged sitting, etc.
28

The activities cited by the ALJ, including going out alone, driving, shopping online (AR 213), and staying sufficiently focused to complete household chores independently are inconsistent with Plaintiff's claim of disabling mental impairment.  Plaintiff, however, never asserted that her mental impairments alone rendered her unable to work.  Rather, she asserted that they made her slower at tasks requiring concentration, which the ALJ accommodated by limiting her to "non-complex, routine tasks" and reading at or below a third-grade level.  AR 15. To the extent Plaintiff still asserts that the mental aspects of the ALJ's RFC determination exceed her abilities, then the inconsistency with her activities of daily living would be a clear and convincing reason to discount that assertion.[5]

### 4.  <u>Reason Four</u>: Course of Treatment.

The ALJ wrote, "The claimant has not generally received the type of medical treatment one would expect for a totally disabled individual."  AR 16. The ALJ then summarized Plaintiff's history of mild clinical findings and improvement with treatment.  AR 16-17.

As Defendant point out, "Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits."  (JS at 30, citing <u>Warre v. Comm'r of Soc. Sec.</u>, 439 F.3d 1001, 1006 (9th Cir. 2006).)  Per the summary of the medical evidence above, substantial evidence supports the ALJ's finding that Plaintiff experienced significant symptom relief with treatment.

---

[5] Plaintiff asserts that "she would be off task significantly more than 20% of the time and likely would be absent from work more than three days per month." (JS at 26.)  It is unclear if Plaintiff asserts this because of her physical impairments (e.g., she will be distracted by pain or need to attend medical appointments) or because of her mental impairments.  No medical source so opined.

# IV.

## CONCLUSION

For the reasons stated above, IT IS ORDERED that judgment shall be entered AFFIRMING the decision of the Commissioner.

DATED:  July 20, 2020

_____
KAREN E. SCOTT
United States Magistrate Judge